COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Petty, Russell and Malveaux
Argued by videoconference


ERIC JOHN PRICE

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1100-20-4              JUDGE MARY BENNETT MALVEAUX
                                                            JUNE 15, 2021

BONNY FRANCES PRICE


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
James P. Fisher, Judge

Erin E. Masin (Warner F. Young; Allred, Bacon, Halfhill & Young,
P.C., on brief), for appellant.

David M. Zangrilli, Jr. (Odin, Feldman & Pittleman, PC, on brief),
for appellee.


Eric John Price ("husband") appeals an order of the circuit court finding him in contempt

for violating provisions of a final order of divorce from Bonny Frances Price ("wife"). Husband

argues the circuit court erred by finding him in contempt and awarding wife attorney's fees. For

the reasons that follow, we affirm the decision of the circuit court and remand for an award of

appellate attorney's fees.

I. BACKGROUND

In accordance with well-established principles of appellate review, we view the facts in

the light most favorable to wife, the party who prevailed in the circuit court. See Shah v. Shah,

70 Va. App. 588, 591 (2019).

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Husband and wife married in 2005 and subsequently had two sons, J. and S.[1]  In 2015, the parties divorced.  Pursuant to their divorce, husband and wife entered into a custody, support, and property settlement agreement ("PSA").  Under the terms of the PSA, the parties would have joint legal custody of J. and S., wife would have primary physical custody of the children, and husband would have visitation rights.  The PSA included additional provisions that are at issue in this appeal.

First, the PSA provided that husband would pay $844 per month in child support and 33.5% of wife's reasonable and necessary work-related childcare costs.  Both these provisions were subject to Paragraph 2(C)(iii) of the PSA, which provided that the parties could "agree upon a revision of . . . child support or their percentage shares for payment of 'child related costs' (i.e., daycare costs . . . , etc.)."

Second, the PSA provided that the parties would share the costs of their children's extracurricular activities.  Specifically, Paragraph 2(E) of the PSA stated that

> [s]ubject to being consulted in advance and agreeing to same, which consent shall not be unreasonably withheld, the parties shall pay, proportionate to their gross incomes last used for calculating child support, the reasonable costs, expenses and/or fees for any of the children's extracurricular and similar type activities/events to include, but not necessarily be limited to, school activity fees, musical instrument purchase or rental fees, fees and costs for reasonable extracurricular activities, sports (e.g., soccer, swimming, etc.) and camps.  Any agreement between the parties to be effective shall be in writing, which can include confirming emails.

Third, the PSA acknowledged and provided for the disposition of several college savings accounts held by the parties for their children.  Specifically, Paragraph 4 of the PSA, entitled "Children's College Educations," noted that husband maintained two Virginia 529 accounts for

---

[1] We use the children's initials, rather than their names, to protect their privacy.

J. and wife maintained an E*TRADE account for each child and a USAA 529 account for S.

Paragraph 4 provided that

> [t]he parties agree that the funds in these accounts and any future accounts which the parties create and choose to use for the children's education, shall be used first at the time the children matriculate in college or other four year post-high school training to cover tuition, room and board, books, standard fees, or other post-high school training for up to four years. . . . [In] the event there are any funds in either child's designated accounts once he has graduated from any post-secondary education, . . . then all remaining funds shall be paid to such child without restriction. . . . Once all educational funds for a child are depleted, it is the intention of the parties to contribute toward additional college expenses for each child as their financial circumstances allow . . . .

Fourth, the PSA noted that husband and wife had contracted with a firm to store umbilical cord blood and tissue for each of their children. Paragraph 7(B) of the PSA provided that husband and wife would equally divide the annual storage fees until each child reached the age of twenty-five. Further, "Wife shall make the annual payment and provide . . . Husband with proof of such payment and . . . Husband shall reimburse his half of the cost within thirty (30) days of receipt thereof."

Fifth, the PSA provided for the disposition of a condominium in Fairfax that the parties owned as tenants by the entirety. Under the terms of the PSA, wife was to convey to husband her title to and interest in the property. Husband would then remove wife from liability for a mortgage on the condominium. Specifically, Paragraph 6(D)(ii) of the PSA provided that "If permitted by a mortgage lender, . . . Husband may do an assumption of the current mortgage . . . . If an assumption is not completed, permitted or preferred, . . . Husband will refinance the current mortgage or otherwise remove . . . Wife from all liability thereon." An assumption, refinance, or some other procedure for removing wife from liability for the mortgage was to be completed within 120 days from the execution of the PSA.

Lastly, Paragraph 27 of the PSA, entitled "Modification or Waiver of Terms," provided that "No modification or waiver of any of the terms of this Agreement shall be valid unless in writing and executed with the same formality as this Agreement." The PSA was signed and notarized by the parties.

The circuit court entered a final order of divorce that incorporated the PSA by reference on September 8, 2015.

Wife's Petitions for Rules to Show Cause

Wife filed a petition for rule to show cause in February 2016 alleging that husband had failed to assume or refinance the mortgage on the condominium within the required time period. In an August 25, 2016 consent order, the circuit court found that husband held title to the condominium and that the property was still encumbered by the mortgage. Under the terms of the order, the parties agreed that husband would convey the condominium to wife and that she would apply to assume the mortgage. The order specifically provided that husband "shall not file for or declare bankruptcy . . . until the assumption process is completed" and that he "shall not allow any additional liens to be brought against the condominium." Husband duly conveyed the condominium to wife.

On October 18, 2019, wife filed an affidavit and petition for rule to show cause. Wife alleged that husband had failed to pay child support since October 2016 and failed to pay his portion of work-related childcare expenses since January 1, 2016. She further contended that husband had not paid his share of any of their children's extracurricular activity expenses since October 2016, failed to pay his portion of the parties' cord blood and tissue storage fees from 2017 through 2019, and liquidated some or all of the funds in J.'s two Virginia 529 accounts. Wife also alleged that husband had impermissibly allowed an additional lien to be brought against the condominium. Specifically, she contended that approximately two weeks before she

- 4 -

would have completed the mortgage assumption process as per the terms of the consent order, husband violated the order by filing for bankruptcy. The mortgage holder then put her assumption application on hold and would not approve it. Thus, wife was unable to assume the mortgage. Further, wife alleged then when she later attempted to sell the property, she discovered that there was a lien against it based upon a judgment against husband. Wife represented that the judgment had been awarded while the parties were negotiating the consent order, that husband had not disclosed it, and that in order to sell the condominium she had to agree to satisfy the judgment. Wife requested the court to find husband in contempt, order him to pay the amounts due her with interest, impose jail time on husband, and award her attorney's fees and costs.

### The Hearing on Wife's Second Petition for Rule to Show Cause

The circuit court conducted a hearing on wife's second petition on September 8, 2020. Relevant proceedings are discussed below.

### Child Support and Childcare Expenses

Wife's exhibits included a spreadsheet documenting each child support payment due and amount received from husband from August 2016 through March 2020, inclusive. The spreadsheet indicated that on numerous occasions husband had either failed to make any payment at all or underpaid the amount due. The spreadsheet also indicated husband's accumulated arrearage.

Wife testified that in 2016 she and husband had several discussions via email about whether she would agree to a change in the amount of child support. She acknowledged that at one point she had agreed to such a change but maintained that she had also provided husband "with instruction as to how I understood some of the PSA [requirements] for it to be binding."

Ultimately, while wife and husband had discussed modifying child support, "the number that he and I . . . discussed [was] never ratified."

Wife's exhibits also included a series of email exchanges in which the parties discussed modifying husband's child support and childcare obligations. On October 25, 2016, wife informed husband that she was "not opposed to adjusting the child support" in order to accommodate husband's strained financial circumstances. On December 9, 2016, wife emailed husband that she had "re-calculated the child support based on your new salary" and "added the daycare costs directly into the spreadsheet so everything is in one place . . . . [T]he attached represents your total monthly payment for support and childcare." On December 14, 2016, wife reminded husband that "the current, court-ordered child support amount is still in place and your portion (to include daycare) is normally about $1250/month. I agreed to change the amount due to $905 as of October 1, 2016 per the calculations I sent but I will not agree to anything else." Wife further stated that "If we cannot mutually agree on a number, then you will need to submit an order to the court to have the child support calculation revised and in the meantime, you will owe the amount currently in place ($1250)."

Husband testified to his belief that the parties had agreed to modify child support.

Extracurricular Activity Expenses

Wife entered into evidence a chart and related invoices detailing the expenses she had paid for the children's extracurricular activities and the amounts owed and unpaid by husband. She testified that the parties had exchanged emails in which "we discussed soccer, we discussed Tae Kwan Do, we discussed tennis" and that husband had stated that "he wanted [J. and S.] involved in activities."

Wife also entered into evidence several email exchanges in which she and husband discussed extracurricular activities for their children. On February 23, 2016, wife emailed

husband the costs of enrolling both J. and S. in soccer camp.  Husband replied six days later, stating "Soccer – OK."  A month later, on March 30, 2016, husband emailed wife to say he had "authorized [her] to sign them up for soccer."  On September 23, 2016, husband emailed wife to ask if there were "plans for sports or extra curricular activities for the boys through the fall / winter?"

On March 30, 2017, husband emailed wife to ask, "Is [J.] signed up to play this Spring? We both discussed his weight and overall health, and agreed that him playing sports and being active this spring is the best way to do that."  Husband also asked, "what about [S.]."  Wife replied that same day that J. had been signed up to play soccer.  On May 16, 2017, husband wrote to wife asking when and where an upcoming match would be held "because I really want to go to that."

On February 7, 2018, husband emailed wife and stated, "The last couple of times I have visited with the boys they have expressed interest in sports this spring."  He further related that J. "has told me on several occasions that he doesn't want to play soccer again.  He is interested in tennis.  I could care less what sports he plays, but he needs to play an organized sport or activity. BOTH boys do, to learn discipline, teamwork, and many lessons in life."  Husband believed this was important "not only for their health, but for their mental development, especially for [S.] – he could use some discipline and routine."  Husband then recommended a local tennis league "that [J.] might be interested in. . . .  As far as [S.], he has expressed interest in Tae Kwon Do." After including a link to an online coupon for martial arts lessons, husband stated, "This I would be willing to buy for [S.]."  Husband asked wife to "keep me updated in [sic] what they are going to be doing this Spring" and told her that "when i [sic] am down there for the weekend visits I will be happy to take them to activities / games . . . ."  Wife emailed husband on February 21, 2018, to say that she had selected a tennis activity for J. and a tae-kwon-do activity for S.

Husband replied on February 28, 2018, stating, "Ok good, please keep me updated on schedules and status of the spring Sports."

Husband emailed wife on January 7, 2019, to state that

> [J.] seems to be really into Tennis and that is great, but he also said that he can't do tennis until the spring . . . . Is there any alternative to having him do nothing until the Spring? Camps / other sports – anything that he can do a couple of times a week?
> Also, for [S.] is he still doing Karate on Tuesdays / Saturdays? . . . I hope he is still doing those classes. . . .
> The point of this email is to have a dialog [sic] with you about them . . . . What can I help with, find classes / or sports for them? Please let me know.

On March 28, 2019, husband emailed wife that he was planning a trip to the area and asked if there were activities such as karate or tennis scheduled for the weekend of his visit.

During the hearing, counsel for husband asked wife about husband's consent to certain activities. Wife clarified that of the extracurricular activities listed in her chart, she had

> discussed [them] with [husband] in terms of his knowledge that these things were happening, yes. Discussed [them] with [him] in terms of me saying is it okay if I sign them up for tennis, or karate, or whatever, . . . there are some emails in where he does agree and suggests a place where I could even sign S[.] up for one of those classes. . . . I wanted them involved in activities, but [husband] was well aware that that was happening, and he was even taking them to games or lessons, or things of that nature, practices when he was down for the weekend. This was not stuff he didn't know about.

Husband testified that he had not reimbursed wife for his share of extracurricular activity expenses because wife "did not follow[] the letter of the . . . PSA, . . . she did not consult me before she signed up for any of [the] activities of the kids as far as extracurriculars." When husband was asked whether he felt he had unreasonably withheld his agreement with respect to extracurricular activities, he responded, "No, I was never asked."

## The 529 Plans

Husband testified that he had withdrawn $52,000 from the two Virginia 529 accounts that he maintained for J. He stated that he had used the withdrawn funds for living expenses during a financially difficult time and that it was his intention to repay the withdrawn funds. Asked whether he had been aware that it violated the terms of the PSA to withdraw the funds, husband replied, "No." Husband further testified that he had been under the impression that he "had . . . up until [J.] graduated high school and was ready to go to college to pay it back."

## Cord Blood and Tissue Storage Fees

Wife maintained that she had not received any payment of husband's share of the parties' cord blood and tissue storage fees for J. and S. She submitted exhibits including an invoice for storage fees from 2017 through 2020 and a series of receipts indicating that wife had paid those fees. Wife's exhibits also contained a copy of a January 31, 2020 email to husband to which wife had attached both the invoice and the copies of her receipts.

## The Lien on the Condominium

Wife testified that she had paid off the lien on the Fairfax condominium as evidenced by the fact that she had subsequently been able to sell the property. Satisfying the judgment against husband in order to have the lien removed had cost her "in the neighborhood of sixteen, seventeen thousand dollars."

Husband acknowledged that the court's August 25, 2016 consent order had required that he not allow any additional liens to be brought against the condominium. He further acknowledged that Bank of America had secured a judgment against him for unpaid credit card debt and a copy of the judgment, dated June 29, 2016, was entered into evidence as one of wife's exhibits. Those exhibits also included a copy of husband's bankruptcy petition, filed on

September 30, 2016, which reflected an unsecured claim against him by Bank of America for credit card debt in the amount of $15,250.

### The Circuit Court's Ruling

Ruling from the bench, the circuit court found husband in contempt. It specifically found that wife was more credible than husband "on the issues that were in dispute in this particular matter." The court determined that the total amount due from husband to wife was $97,563.95 and also awarded wife $11,143.50 in attorney's fees. Husband's purge amount was set at $75,000, and the remainder of the amount due from him would be paid by husband in twenty-four monthly installments.

In an order dated September 18, 2020 the circuit court memorialized its ruling that husband was in willful disobedience of its orders. The court made clear that the $97,563.95 due from husband included $52,000 for monies withdrawn from J.'s 529 college saving plans and that to purge his contempt, husband would have to pay a lump sum amount of $75,000 "either directly to [wife] or to the Clerk of the Court."

Husband appealed to this Court.

### II. ANALYSIS

Husband argues that the circuit court erred in finding him in contempt for violating its orders, including the final order of divorce incorporating the parties' PSA.

"[W]e review the exercise of a court's contempt power under an abuse of discretion standard. [A] trial court by definition abuses its discretion when it makes an error of law." Mills v. Mills, 70 Va. App. 362, 373 (2019) (alterations in original) (citation omitted) (quoting Zedan v. Westheim, 60 Va. App. 556, 574 (2012)). A court may also abuse its discretion when "a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper

- 10 -

factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." Shebelskie v. Brown, 287 Va. 18, 26 (2014) (quoting Lawlor v. Commonwealth, 285 Va. 187, 213 (2013)). When reviewing a contempt finding where the "'evidence was taken *ore tenus*[,] . . . the conclusion on the facts stands upon the same plane as the verdict of a jury.' As such, the circuit court's factual findings may 'not be disturbed on appeal unless plainly wrong or without evidence to support' them." Mills, 70 Va. App. at 373 (alterations in original) (citation omitted) (first quoting Drake v. Nat'l Bank of Com. of Norfolk, 168 Va. 230, 240 (1937); then quoting Ware v. Ware, 203 Va. 189, 195 (1962)).

A circuit court's reading of a PSA presents a question of law that is reviewed *de novo*. Id. This is so because PSAs "are contracts subject to the same rules of formation, validity, and interpretation as other contracts." Allen v. Allen, 66 Va. App. 586, 595-96 (2016) (quoting Bergman v. Bergman, 25 Va. App. 204, 211 (1997)). "In construing the terms of a property settlement agreement, just as in construing the terms of any contract, [this Court is] not bound by the trial court's conclusions as to the construction of the disputed provisions." Id. at 595 (alteration in original) (quoting Smith v. Smith, 3 Va. App. 510, 513 (1986)). However, "[i]f all the evidence which is necessary to construe a contract was presented to the trial court and is before the reviewing court, the meaning and effect of the contract . . . can readily be ascertained by this [C]ourt." Id. (second alteration in original) (quoting Fry v. Schwarting, 4 Va. App. 173, 180 (1987)).

"In Virginia, '[i]t is axiomatic that when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning. Words that the parties used are normally given their usual, ordinary, and popular meaning.'" Cabral v. Cabral, 62 Va. App. 600, 609-10 (2013) (alteration in original) (citation omitted) (quoting TravCo Ins. Co. v. Ward, 284 Va. 547, 552 (2012)). We must also "assume[] that no word or clause is without

purpose." Allen, 66 Va. App. at 596. Further, "[a] contract is not ambiguous merely because the parties disagree as to the meaning of the terms used" and it will be "construed as written, without adding terms that were not included by the parties." Id. (quoting TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C., 263 Va. 116, 119 (2002)). "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." Craig v. Craig, 59 Va. App. 527, 536 (2012) (quoting Irwin v. Irwin, 47 Va. App. 287, 293 (2005)).

A. Child Support and Childcare Expenses

Husband argues that the circuit court erred by finding him in contempt for failure to pay child support and his share of wife's work-related childcare costs. He contends that his childcare and support obligations were "legally changed without a Court Order" by the "[m]odification entered in to by the parties on or about December 9, 2016," as permitted by the PSA. Husband argues that because the modification, "while binding on [husband], was not a Court Order," if he "failed to comply with its terms there [was] no cause of action for contempt."[2]

Husband's argument is unpersuasive. As noted above, wife testified that in 2016 the parties exchanged emails in which they discussed whether she would agree to a change in the amount of child support. Wife acknowledged that at one point she agreed to such a change but maintained that "the number . . . discussed [was] never ratified." Wife's emails, entered into evidence, reflect that on December 9, 2016, wife emailed husband that she had "re-calculated the child support" while adding daycare costs to produce a new total monthly payment for support

---

[2] We note that at the hearing, husband argued that child support may not be modified without a court order but that language in the PSA "suggest[ing] that the parties can, with or without a court order, enter [into] an agreement" to modify support led him to believe the parties had agreed to a valid modification. It was only after husband retained new counsel that he advanced the argument presented on brief and in oral argument before this Court.

and childcare. On December 14, 2016, wife emailed husband that she had "agreed to change the amount due to $905." However, she also stated that "If we cannot mutually agree on a number, then you will need to submit an order [sic] to the court to have the child support calculation revised and in the meantime, you will owe the amount currently in place ($1250)." Even assuming *arguendo* that the parties' emails indicated an agreement to modify husband's child support and childcare obligations, that agreement did not satisfy the requirements for a modification under the terms of the PSA. As noted above, Paragraph 27 of the PSA provides that "[n]o modification . . . of any of the terms of this [PSA] shall be valid unless in writing and executed with the same formality as this [PSA]." Here, the parties' emails, including wife's email of December 9, 2016, did not constitute writings executed with the same formality as the PSA—*i.e.*, the email communications were not signed and notarized by the parties. Accordingly, the parties did not modify the terms of the PSA as alleged by husband. Husband remained obligated to pay the child support and childcare expenses provided for by the PSA. Further, wife provided credible testimony and other evidence that husband did not meet those obligations. Accordingly, we hold that the circuit court did not err in finding husband in contempt for failure to pay child support and his portion of the parties' childcare costs.[3]

## B. Extracurricular Activity Expenses

Husband argues that the circuit court erred by finding him in contempt for failure to pay his share of the children's extracurricular activity expenses. Specifically, he contends that wife "provided no evidence of [his] prior written agreement to any specific activity" and that she also "provided no evidence that she consulted [husband] 'in advance' of scheduling any

---

[3] Husband further argues that the modification agreement of the parties was "done in compliance with . . . Code [§] 20-109.1 and was self-executing," and thus that the parties were not required to seek a modification order from the circuit court. Given our resolution of this issue, we need not reach this argument.

extracurricular activity." Consequently, husband argues, the court ignored the requirements of the PSA and ignored the evidence in finding him in contempt for failing to pay his portion of the relevant expenses.

We are not persuaded by husband's argument. As noted above, Paragraph 2(E) of the PSA provides that "[s]ubject to being consulted in advance and agreeing to same, which consent shall not be unreasonably withheld," the parties shall each pay a proportion of the reasonable costs, expenses, and fees for their children's extracurricular activities. Paragraph 2(E) further provides that "[a]ny agreement between the parties to be effective shall be in writing, which can include confirming emails." Although the PSA does not define the term "agreement," we note that the plain, usual, and ordinary meaning of that term is "[a] mutual understanding between two or more persons . . . ; a manifestation of mutual assent by two or more persons." Agreement, Black's Law Dictionary (11th ed. 2019). See also id. (defining "agree" as "[t]o unite in thought; to concur in opinion or purpose," or to "unite in an engagement to do or not do something").

Here, wife testified that she had discussed the children's extracurricular activities with husband "in terms of his knowledge that these things were happening" and "in terms of me saying is it okay if I sign them up for tennis, or karate, or whatever." She further testified that there were "some emails in where he does agree." Wife also stated that she wanted the children "involved in activities" and that husband "was well aware that that was happening, and he was even taking them to games or lessons, or things of that nature, practices when he was down for the weekend. This was not stuff he didn't know about." Wife's evidence also included numerous emails between herself and husband detailing their consultations about their children's extracurricular activities. Both husband and wife expressed concern that their children should be involved in activities that would contribute to their health and well-being. When wife emailed husband about enrolling the children in soccer programs, husband replied, "Soccer – OK." He

subsequently explicitly confirmed that he had authorized her "to sign them up for soccer" and expressed interest in attending their games. After J. and S. expressed to husband that they were, respectively, interested in tennis and martial arts, husband recommended programs for the two children and asked wife to keep him updated on what the children would be doing. Wife then emailed husband to say she had selected martial arts and tennis programs for the children and husband replied, "Ok good, please keep me updated on schedules and status." When wife subsequently wrote husband that the children's programs would be starting soon, he responded by asking whether J. and S. would have any activities scheduled for a certain date so that he could take them to the activities. Husband also expressed an interest in helping to find "classes / or sports for them" to enroll in. In advance of trips to the area, husband specifically asked if there were activities scheduled for the periods of his visit.

The parties' email exchanges and wife's testimony, which the circuit court found more credible than husband's, do not support husband's argument at trial and on brief that wife did not consult him in advance before scheduling any extracurricular activities and that he did not give prior written agreement to any activities. Instead, they demonstrate that the parties manifested in writing their mutual assent to their children participating in extracurricular classes and sports and a mutual understanding that their children would participate in the activities.[4] Thus, the record does not support husband's argument that the circuit court erred in finding him in contempt for failing to pay his share of those expenses as required by the terms of the PSA. Accordingly, we

---

[4] Further, even assuming *arguendo* that the evidence failed to demonstrate a manifestation of the parties' mutual written assent to their children's activities, husband's repeated expression of his desire that the children be involved in such activities would render any objections to them an unreasonable withholding of consent.

hold that the circuit court did not abuse its discretion by finding husband in contempt for failure to pay his share of extracurricular activity expenses.[5]

## C. The Virginia 529 Accounts

Husband argues that the circuit court erred by finding him in contempt for withdrawing funds from the two Virginia 529 accounts he maintained for J. Specifically, husband contends that there was "no 'express command'" in the PSA that prohibited him from removing funds from the 529 accounts or "otherwise restricted [him] from utilizing the funds for other necessary purposes, or . . . borrowing funds from the account[s]." Husband's argument is premised on his reading of Paragraph 4 of the PSA, which as noted above states that

> [t]he parties agree that the funds in these accounts and any future accounts which the parties create and choose to use for the children's education, shall be used first at the time the children matriculate in college or other four year post-high school training to cover tuition, room and board, books, standard fees, or other post-high school training for up to four years.

Husband contends that the paragraph's limitations on when funds may be withdrawn and how they must be used apply only to funds from accounts which the parties "choose to use for the children's education," and thus "[t]here is no prohibition . . . that the parties not withdraw funds for any other purpose than . . . to use for the children's education."

Husband's argument is unpersuasive because it ignores both the clear intent of the parties in drafting Paragraph 4 and the plain language of the paragraph. The purpose of this provision of the PSA was to provide for the post-secondary education of the parties' children. Paragraph 4

---

[5] Husband further argues that the circuit court erred "when it found . . . that [husband] had a duty to reimburse [wife] for the payment of extracurricular activities when [wife] failed to comply with the terms of the Divorce Decree and the Agreement." Consequently, husband contends, the court "created its own interpretation of the PSA and Divorce Decree . . . and deleted the prerequisites created by the Parties." We note that the circuit court made no such finding that husband had a duty to reimburse when wife was in noncompliance with the final order of divorce and the PSA. Consequently, we do not consider that argument.

acknowledges that at the time of the execution of the PSA, there were several existing accounts maintained for the parties' children, including both the Virginia 529 accounts at issue here and an additional USAA 529 account for S. The express purpose of 529 accounts is to provide for the expenses of higher education. See 26 U.S.C. § 529(a)-(b) (providing, in pertinent part, for the establishment of tax-exempt programs under which persons "may make contributions to an account which is established for the purpose of meeting the qualified higher education expenses of the designated beneficiary of the account"). Paragraph 4 acknowledges not only "the[] accounts" in existence when the PSA was executed but also anticipates that there might be "future accounts which the parties create" after the execution of the PSA. In order for any "future accounts" to be subject to the provisions of Paragraph 4 in the same way that the pre-existing accounts were subject to the paragraph's provisions for higher education, they would have to be created for the same purpose, *i.e.*, to provide for the post-high school education of J. and S. Thus, it would be necessary for the parties to "choose to use [such future accounts] for the children's education" in order for those new accounts to be subject to the terms of Paragraph 4. Consequently, the phrase "choose to use for the children's education" can only refer back to any "future accounts" created after the execution of the PSA, not to "the[] accounts" enumerated by Paragraph 4 at the time of execution. Stated differently, the parties had already "cho[sen] to use" the Virginia 529 and other enumerated accounts solely for their children's education by virtue of including them in Paragraph 4 when they drafted the PSA. The additional language of the paragraph supports this reading, as it is concerned with: insuring that accounts governed by the paragraph are not depleted before the children's matriculation in post-secondary education; preventing the children from having unrestricted access to any remaining funds until they have completed their post-secondary education or attained the age of twenty-five; and encouraging the provision of additional educational funding "[o]nce all

- 17 -

educational funds for a child are depleted." Because husband's reading of Paragraph 4 of the PSA does not comport with the plain language of the provision and the parties' clear intent in drafting it, we hold that the circuit court did not abuse its discretion when it found husband in contempt for withdrawing funds from J.'s Virginia 529 accounts before J. matriculated in post-high school education.[6]

### D. Cord Blood and Tissue Storage Fees

Husband argues that the circuit court erred by finding him in contempt for failing to pay his portion of the parties' cord blood and tissue storage fees. He notes the requirement of Paragraph 7(B) of the PSA that "Wife shall . . . provide . . . Husband with proof of such payment [of the fees] and . . . Husband shall reimburse his half of the cost within thirty (30) days of receipt thereof." Husband contends that wife did not satisfy the notification requirements of the PSA because he was only provided with proof of payment "the day prior to her executing her Petition . . . and fifteen days prior to her filing the Rule to Show Cause swearing that [husband] was already in violation of the PSA and Divorce Order." Thus, husband argues, "instead of adhering 'to the plain meaning of [the] stated terms' of the PSA, the [c]ircuit [c]ourt 'rewrote'

---

[6] Husband also assigns error to the circuit court for "order[ing] [husband] to pay back the [529 plan] funds directly to [wife]." He asserts that the court required him to "pay Fifty-Two Thousand Dollars . . . directly to [wife]" and that the court "at most could have ordered that [he] repay the amounts directly to the 529 Plan Account[s], and not to [wife]." We note that the circuit court did not, in fact, order husband to pay $52,000 directly to wife. Rather, the court ordered husband to pay a purge amount of $75,000 "either directly to [wife] or to the Clerk of the Court." We further note that even if husband had elected to pay $75,000 directly to wife, that amount was not specifically "to pay back the [529 plan] funds." Instead, it was the amount the court determined was necessary to "purge [husband's] contempt"—i.e., to rectify his "willful disobedience of th[e] Court's Orders" and thus obtain his release from the court's sanction of jail. See, e.g., Mills, 70 Va. App. at 381 (noting that a "contempt sanction based on an affirmative order addresses an ongoing contemptuous act that, due to its ongoing nature, may be purged at any moment by the contemnor's performance of the mandated act" (quoting Int'l Union, United Mine Workers of Am. v. Covenant Coal Corp., 12 Va. App. 135, 144 (1991))).

the parties' agreement to require [husband to] pay his share of the [fees] whether [wife] provided proof of payment or not."

Husband's argument is without merit. As noted above, wife entered into evidence both an invoice for cord blood and tissue storage fees for the years 2017 through 2020 and a series of receipts for her payment of those fees. Wife also entered into evidence a copy of her January 31, 2020 email to husband, to which she had attached both the invoice and copies of her receipts. The hearing on wife's petition for rule to show cause occurred on September 8, 2020, more than thirty days after wife "provide[d] . . . [h]usband with proof of her payment" of the fees. At the hearing, wife maintained that she had not received any payment of husband's share of the fees, and husband neither testified nor introduced other evidence to indicate that he had paid wife within thirty days of receiving her January 31, 2020 email. Thus, contrary to husband's argument, in finding him in contempt the circuit court did not rewrite the parties' agreement but instead adhered to and applied the plain meaning of the terms of Paragraph 7(B) of the PSA. Accordingly, we hold that the circuit court did not abuse its discretion when it held husband in contempt for failing to pay his portion of the parties' cord blood and tissue storage fees.

### E. Creation of a Lien on the Condominium

Husband argues that the circuit court erred by finding him in contempt for creating a lien on the Fairfax condominium. He contends that the lien at issue was "created . . . by Bank of America" and that he never received notice of the bank's suit, was not afforded the opportunity to dispute it, and had no opportunity to prevent a lien from being placed on the property. Thus, "the lien came into existence by a series of failures outside of [husband's] control" and "without [his] knowledge or consent," and "[a]ccordingly, the circuit court should have ruled that [he] was not in Contempt of Court related to [the] lien, and in fact had taken the necessary steps to resolve the underlying debt through his bankruptcy."

- 19 -

We are not persuaded by husband's argument. As noted above, in its consent order of August 25, 2016, the circuit court found that husband held title to the condominium and that the property was still encumbered by the parties' mortgage. The parties agreed that husband would convey the condominium to wife and that she would apply to assume the mortgage. The consent order specified that husband "shall not file for or declare bankruptcy . . . until the assumption process is completed" and that he "shall not allow any additional liens to be brought against the [c]ondominium." Husband acknowledged the consent order's lien provision in his testimony. He conveyed the condominium to wife as agreed under the order, although prior to that conveyance, Bank of America had obtained a judgment against him. Husband acknowledged in his testimony that the bank had secured its judgment based upon his unpaid credit card debt and a copy of the judgment was entered into evidence by wife.

In her affidavit and petition for rule to show cause, wife alleged that about two weeks before she completed the mortgage assumption process as per the consent order, husband violated the order by filing for bankruptcy. Consequently, the mortgage holder put her assumption application on hold and wife was unable to assume the mortgage. Wife further alleged that when she later attempted to sell the condominium, she discovered there was a lien against the property based upon Bank of America's judgment against husband. At the hearing, wife testified that she had paid off the lien but that satisfying the judgment against husband in order to remove the lien had cost her approximately sixteen or seventeen thousand dollars.

Although husband argues that the lien was "created" by Bank of America and that it "came into existence by a series of failures outside of [his] control," that is clearly not the case. Husband acknowledged that the judgment against him, which the bank perfected into a lien against the condominium, was based upon his unpaid credit card debt. It thereby follows that the lien was created as a consequence of husband's conduct: his accrual of the debt and subsequent

- 20 -

failure to pay it in a timely fashion, leading in turn to the judgment and then to the lien. See

Create, Webster's Third New International Dictionary (2002) (defining "create" as "to cause to

be"). Accordingly, we hold that the circuit court did not abuse its discretion in finding husband

in contempt of its consent order for allowing an additional lien to be brought against the

condominium.[7] See Bajgain v. Bajgain, 64 Va. App. 439, 453 (2015) (noting that we give

deference to a circuit court's interpretation of its own orders and review such an interpretation

for abuse of discretion).

## F. Attorney's Fees

Husband argues that the circuit court erred by awarding wife the attorney's fees she

incurred during the contempt proceedings below. We review an award of attorney's fees for

abuse of discretion. See Koons v. Crane, 72 Va. App. 720, 742 (2021).

Husband contends that because the court erred by finding him in contempt it necessarily

abused its discretion by awarding wife attorney's fees. Finding no error by the circuit court in its

contempt determination, we reject husband's argument and affirm the court's award.[8]

---

[7] Husband further argues that the lien issue is "moot before this court" because it was "resolved . . . between the parties" when wife agreed to satisfy the judgment to remove the lien so she could sell the property. We note that the plain language of the consent order prohibits husband from allowing any additional liens to be brought against the condominium, *per se*; nothing in the language of the order provides that husband can "cure" a violation of the lien prohibition through an agreement with wife or by any other means.

[8] Husband also argues that the circuit court erred by failing to consider his ability to pay when it found him in contempt. He contends that the court should have found that even if his actions were in violation of the PSA, he was not in contempt, as his "actions were not 'willful disobedience of a proper order' because [he] was 'unable to comply' with the order as a result of his pecuniary status."
"[T]o hold a litigant in contempt, the litigant must be acting in bad faith or [in] willful disobedience of [the court's] order." Koons, 72 Va. App. at 737 (alterations in original) (quoting Zedan, 60 Va. App. at 574-75). It follows that "[i]n Virginia, inability to pay is a defense to a charge of contempt." Street v. Street, 24 Va. App. 14, 20 (1997). In accordance with these principles, we note that "[i]n a show cause hearing, the moving party need only prove that the offending party failed to comply with an order of the trial court. Once the movant proves noncompliance, 'the burden is on the obligor to provide justification for failure to comply.'"

## G. Appellate Attorney's Fees for Wife

Wife requests that this Court award her attorney's fees and costs incurred on appeal. Code § 20-109(C) provides that where, as here, the parties execute a PSA prior to entry of a final decree of divorce, "no decree or order directing the payment of . . . suit money, or counsel fee[s] . . . shall be entered except in accordance with that . . . contract." This appeal, like the proceeding below, is part of an enforcement action with respect to the PSA. The terms of the parties' PSA provide that if either party takes legal action against the other "by reason of the other's failure to abide by this [PSA], the party who substantially prevails shall be awarded his or her reasonable attorney fees . . . , court costs, and other costs reasonably incurred in the enforcement of this [PSA], all in the discretion of the Court." Accordingly, we remand to the circuit court to determine what fees and costs wife is entitled to for this appeal under the terms of the PSA.

## III.  CONCLUSION

For the foregoing reasons, we affirm the decision of the circuit court finding husband in contempt and remand for a determination of wife's appellate attorney's fees.

*Affirmed and remanded.*

---

Koons, 72 Va. App. at 737-38 (citation omitted) (quoting Barnhill v. Brooks, 15 Va. App. 696, 704 (1993)).

    At the show cause hearing, wife established that husband had failed to comply with several of his obligations under the PSA and that he violated other provisions of the court's orders. Husband defended in part by arguing that he had been unable, rather than unwilling, to meet his financial and other obligations because of his financial circumstances. However, he did not provide the circuit court with any documents in support of his argument, such as pay stubs, unemployment benefit forms, or bank or retirement account statements. While wife's exhibits included husband's bankruptcy filing and numerous emails asserting husband's inability to pay certain sums, those documents of themselves do not prove husband was unable to meet his financial obligations. Further, the court specifically found wife more credible in her testimony than husband. Accordingly, the record does not support that husband met his burden to provide financial justification for his failure to comply with the requirements of the court's orders, including its final order of divorce incorporating the PSA. Thus, we hold that the court did not abuse its discretion in failing to consider husband's ability to pay.